UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KATHERINE UMFRESS,                          )
                                            )
         Plaintiff,                         )
                                            )
vs.                                         )          Case No. 1:11CV00096 LMB
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
                                            )
         Defendant.                         )

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Katherine Umfress for Supplemental Security Income under Title XVI of the Social Security Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint. (Doc. No. 16).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 17).

**Procedural History**

On June 17, 2008, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on March 31, 2005.  (Tr. 133-36).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated April 21, 2010.  (Tr. 62, 88-93, 10-25). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 7, 2011.  (Tr. 1-5).  Thus, the

- 1 -

decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on January 5, 2010.  (Tr. 32).  Plaintiff was present and was represented by counsel.  (Id.).  Vocational expert Greg Reimholt appeared by telephone.  (Id.).

The ALJ examined plaintiff, who testified that she was twenty-five years of age and had a tenth grade education.  (Tr. 35).  Plaintiff stated that she quit school because she was depressed from worrying about her father.  (Id.).  Plaintiff testified that her father advised her to quit school and try to obtain her GED.  (Id.).  Plaintiff stated that she took the GED test on one occasion and failed.  (Tr. 36).  Plaintiff explained that she scored low in the subjects of math, science, and social studies.  (Id.).

Plaintiff testified that she had not received any vocational training.  (Id.).  Plaintiff stated that she did not take special education classes when she was in school.  (Id.).  Plaintiff testified that she received speech therapy until she was in ninth grade.  (Tr. 37).  Plaintiff stated that she had difficulty pronouncing long words.  (Id.).

Plaintiff testified that she worked at a home health position in 2007.  (Tr. 39).  Plaintiff explained that she was paid by the State to take care of her mother-in-law.  (Id.).  Plaintiff testified that she helped her mother-in-law take her medication, made her bed, swept, mopped, vacuumed, and washed dishes.  (Id.).  Plaintiff stated that she was able to perform this position until she became unable to bend over to pick up items, or push or pull.  (Id.).  Plaintiff testified

- 2 -

that she was expected to perform her duties even though her client was her mother-in-law.  (Tr.

40).  Plaintiff stated that she worked at this position from November 2006 through February

2008.  (Id.).  Plaintiff testified that she worked approximately fifteen hours a week.  (Id.).

Plaintiff stated that she earned approximately $200.00 a week at this position.  (Tr. 41).  Plaintiff

testified that this was her last position.  (Id.).

Plaintiff stated that she worked as a cashier in a department store from April or May of

2003 through August of 2003.  (Id.).

Plaintiff testified that she stopped working in February of 2008 because she started

experiencing medical problems.  (Id.).  Plaintiff stated that she experienced back pain and muscle

spasms.  (Tr. 42).

Plaintiff testified that she lived with her husband in a one-story house.  (Id.).

Plaintiff stated that she enjoyed swimming when her medical problems allowed her to

swim.  (Id.).  Plaintiff testified that she last swam in July of 2009.  (Tr. 43).

Plaintiff stated that she was able to walk for one half of a block to one block.  (Id.).

Plaintiff testified that her back would start "spazzing out," and her legs would "probably go out

from underneath [her]" if she tried to walk farther.  (Id.).  Plaintiff stated that she had

degenerative disc disease[1] in her lumbar[2] spine.  (Id.).  Plaintiff testified that, when her legs go

---

[1]A general term for both acute and chronic processes destroying the normal structure and
function of the intervertebral discs.  See J. Stanley McQuade, Medical Information Systems for
Lawyers, § 6:201 (1993).

[2]In common terms, the cervical region of the spinal column is the neck; the thoracic region
is the main part of the back; and the lumbar region is the lower back.  There are seven cervical
vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below
the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See Medical
Information Systems for Lawyers, § 6:27.

out, her knees buckle and she falls to the ground. (Tr. 44).

Plaintiff stated that she was able to stand for ten to fifteen minutes before she started to experience back pain. (Id.).

Plaintiff testified that she had difficulty lifting items because she loses her grip. (Id.). Plaintiff stated that she was unable to lift a twenty-five-pound bag of dog food. (Tr. 45). Plaintiff testified that "might" be able to carry a gallon of milk. (Tr. 45). Plaintiff stated that she would be unable to grip a ten-pound flower pot. (Id.).

Plaintiff testified that she did not have a driver's license. (Tr. 46). Plaintiff stated that she had never taken the driver's license test because the material in the test preparation book was too difficult for her to read. (Id.). Plaintiff testified that she was able to read but she had difficulty comprehending. (Id.).

Plaintiff stated that she enjoyed doing word finds and reading. (Id.). Plaintiff testified that she read children's books. (Id.).

The ALJ noted that there was no evidence in the record that plaintiff had undergone IQ testing. (Tr. 47). The ALJ indicated that he would "get back to that," and instructed plaintiff's attorney to "prepare to entertain discussions about having some testing done." (Id.).

Plaintiff testified that she had been prescribed pain medication, but that her prescription had expired in September of 2009. (Tr. 48-49). Plaintiff stated that she was only taking over-the-counter pain medication at the time of the hearing. (Id.).

Plaintiff testified that she took medication for acid reflux, and for allergies. (Tr. 49).

Plaintiff stated that she had taken an antidepressant in the past for depression, but was no longer taking it because she was unable to afford the medication. (Id.). Plaintiff testified that she

- 4 -

did not have Medicaid benefits.  (Id.).  Plaintiff stated that she last took antidepressant medication

in October of 2009.  (Tr. 50).

Plaintiff testified that her husband works three-and-a-half hours a day taking care of his

mother.  (Id.).  Plaintiff stated that her mother-in-law lived nearby.  (Id.).

Plaintiff testified that she was unable to do any housework when her husband was

working.  (Id.).  Plaintiff stated that she tried to prepare meals for herself.  (Id.).  Plaintiff testified

that she spent her days watching television, doing word puzzles, or reading.  (Tr. 51).

Plaintiff stated that her biggest medical problem was the muscle spasms in her back.  (Id.).

Plaintiff testified that she was not seeing a doctor for her back impairment, and that she last saw a

doctor in September of 2009.  (Id.).  Plaintiff stated that the last doctor she saw was Dr. Jerry

Muse at the Campbell Clinic.  (Id.).  Plaintiff testified that no doctor has ever recommended back

surgery, physical therapy, or injections.  (Tr. 52).

Plaintiff stated that she and her husband enjoyed swimming.  (Id.).  Plaintiff testified that

she watched her nephews on the weekend, and that her nephews also enjoyed swimming.  (Id.).

Plaintiff testified that her "number two problem" was her depression.  (Tr. 53).  Plaintiff

stated that she had seen Dr. Price Gholson, who was a mental health professional.  (Id.).  Plaintiff

testified that she saw Dr. Gholson in November 2009, and that she was referred by the state

agency.  (Tr. 54).  Plaintiff stated that this was the last time she saw a mental health professional.

(Id.).

Plaintiff testified that her family doctor was prescribing her antidepressants.  (Id.).

Plaintiff stated that her family doctor referred her to Shahid Choudhary, and that Dr. Choudhary

diagnosed her with degenerative disc disease and muscle spasms.  (Id.).

Plaintiff testified that she had seen a counselor two or three times for evaluations.  (Tr. 55).  Plaintiff stated that she had never seen a professional for counseling or attended group therapy.  (Id.).

Plaintiff testified that her depression made her want to stay in a dark room by herself and cry.  (Id.).  Plaintiff stated that she did not want to be around people, take showers, or eat when she was depressed.  (Id.).

Plaintiff testified that her knees buckle.  (Tr. 56).  Plaintiff stated that Dr. Choudhary told her that the knee buckling and problems with her hands were related to her back impairment. (Id.).

Plaintiff's attorney examined plaintiff, who testified that she had tendonitis[3] in her left wrist.  (Id.).

Plaintiff stated that she had not taken any prescription medication since her Medicaid coverage expired.  (Tr. 57).  Plaintiff testified that she took over-the-counter pain medication and used a heating pad.  (Id.).  Plaintiff stated that she also took hot showers.  (Id.).  Plaintiff testified that she applied heat once or twice a day.  (Id.).

Plaintiff stated that she had bad days when she did not shower or do anything approximately three to four times a week.  (Id.).  Plaintiff testified that she experienced these bad days due to a combination of pain and depression.  (Id.).

Plaintiff stated that her knees buckle.  (Id.).  Plaintiff indicated that she did not know whether she was referring to her knee joints or her legs because she did not know the difference. (Id.).

---

[3]Inflammation of a tendon.  Stedman's Medical Dictionary, 1944 (28th Ed. 2006).

Plaintiff testified that she had some days during which she functioned fairly well.  (Tr. 58).

Plaintiff stated that her husband took her to visit her parents on these days.  (Id.).

Plaintiff testified that when she goes swimming with her family, she does not really swim, but just sits in the pool.  (Id.).

Plaintiff stated that she did not complete the tenth grade.  (Id.).  Plaintiff testified that she attended class until January of her tenth grade school year, and then started taking GED classes. (Id.).  Plaintiff stated that she did not take any special education classes, although it was recommended that she take such classes.  (Id.).

The ALJ indicated that he did not consider any of plaintiff's past work to be substantial gainful activity.  (Tr. 59).  The ALJ stated that he did not, therefore, need to ask the vocational expert any questions to establish plaintiff's past work record and skills.  (Id.).

The ALJ re-examined plaintiff, who testified that she was five-feet seven-inches tall, and weighed 230 pounds.  (Id.).

## B.      Relevant Medical Records

The record reveals that plaintiff presented to Twin Rivers Regional Medical Center on May 25, 2008, with complaints of left wrist pain due to a fall she sustained three weeks prior. (Tr. 210).  Plaintiff underwent x-rays of her left wrist, which was negative for fracture, but revealed mild degenerative changes.  (Tr. 219).  Plaintiff was diagnosed with left wrist pain, and was discharged with instructions to wear a wrist splint and take over-the-counter pain medication. (Tr. 218).

On July 24, 2008, plaintiff saw Paul W. Rexroat, Ph.D., for a psychological examination at the request of the state agency.  (Tr. 260-63).  Plaintiff reported that she had never seen a mental

health professional, although her nurse practitioner prescribed Zoloft[4] for six months when she

was depressed at the age of fifteen because her father was in prison.  (Tr. 261).  Upon mental

status examination, plaintiff was nicely dressed and groomed, exhibited a mildly restricted range

of emotional responsiveness and a slightly flat affect.  (Id.).  Plaintiff appeared to have a normal

energy level, and was alert and cooperative.  (Id.).  She had a normal gait and posture, and no

involuntary movements.  (Id.).  Plaintiff's speech was normal, coherent, and relevant, with no

evidence of a thought disorder.  (Id.).  Plaintiff reported frequent mood swings, with depression

and irritability.  (Id.).  Plaintiff stated that she felt sad and hurt, wanted to cry, and wanted to stay

in her bedroom by herself.  (Id.).  Plaintiff denied any suicidal or homicidal ideation or attempts.

(Id.).  Plaintiff reported that, at times, she heard a dead friend, her grandparents, and uncles "send

[her] messages they want [her] to tell other people."  (Id.).  Dr. Rexroat estimated plaintiff's IQ

as below average.  (Tr. 262).  Dr. Rexroat stated that plaintiff described significant symptoms of

major depression with psychotic features.  (Id.).  Dr. Rexroat found that plaintiff was able to

understand and remember simple instructions, sustain concentration and persistence with simple

tasks, and interact socially and adapt to her environment.  (Id.).  Dr. Rexroat indicated that

plaintiff had few limitations in her activities of daily living, and in her social functioning.  (Id.).

Dr. Rexroat diagnosed plaintiff with major depression,[5] recurrent, moderate with psychotic

---

[4]Zoloft is an antidepressant indicated for the treatment of depression and other mood
disorders.  See WebMD, **http://www.webmd.com/drugs** (last visited August 20, 2012).

[5]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and
appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's at 515.

features; and a GAF score[6] of 55.[7]  (Tr. 263).

Plaintiff saw Patrick J. Lecorps, M.D. on July 29, 2008, at the request of the state agency. (Tr. 266).  Plaintiff complained of low back pain for three to four years secondary to a motor vehicle accident.  (Id.).  Plaintiff also reported occasional radiation to her lower limbs, which did not last long.  (Id.).  Plaintiff was taking no prescription pain medication.  (Id.).  Plaintiff reported that she feels better when she lies down.  (Id.).  Upon examination, plaintiff was able to bend over and touch her toes; hyperextension of the lumbosacral spine was normal; lateral flexion on the right and left side was normal; reflexes were normal; and plaintiff's straight leg raising test was about seventy degrees bilaterally with no pain.  (Id.).  Plaintiff underwent x-rays of the lumbosacral spine, which revealed no abnormalities.  (Id.).  Dr. Lecorps' impression was low back pain "of unknown etiology."  (Id.).

On July 31, 2008, Dr. Lecorps completed a "Physician's Certification/Disability Evaluation," in which he expressed the opinion that plaintiff had a disability that was expected to last three to five months.  (Tr. 272-73).  Dr. Lecorps provided no additional information.  (Id.).

On August 7, 2008, Dr. Rexroat completed a "Physician's Certification/Disability Evaluation" form, in which he expressed the opinion that plaintiff had a disability that was expected to last twelve months or more.  (Tr. 270).  Dr. Rexroat indicated that plaintiff's

---

[6]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[7]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

diagnosis was major depression, recurrent, moderate with psychotic features.  (Id.).

Plaintiff presented to the emergency room at Twin Rivers Regional Medical Center on August 31, 2008, with complaints of left side and left arm pain after being pushed into a bar.  (Tr. 311).  Plaintiff was discharged after reporting that her pain had improved.  (Tr. 314).

On January 13, 2009, plaintiff underwent surgery to correct a deviated nasal septum.  (Tr. 321).  Plaintiff followed-up with the otolaryngologist on multiple occasions for post-surgical examinations and complaints of allergies, and sore throat.  (Tr. 315-20).

Plaintiff presented to Price Gholson, Psy.D. on April 24, 2009, for a psychological examination.  (Tr. 279-84).  Plaintiff reported that she worried about her father, her sleep was "so-so," her mood was better, and she experienced some irritability and intense anger when she was without medication.  (Tr. 280).  Plaintiff indicated that she only isolated herself when she was having a "stress headache."  (Id.).  Plaintiff stated that she felt "pretty good about her life."  (Id.). Dr. Gholson noted that plaintiff was taking Citalopram,[8] which was prescribed by Dr. Muse. (Id.).  Dr. Gholson indicated that plaintiff also experienced anxiety, some difficulty getting along with others, and mild to moderate depression.  (Id.).  Dr. Gholson found that plaintiff's intellectual functions were normal, except that her remote memory and ability to perform serial sevens were below average, and her ability to make change from a dollar was very low.  (Tr. 283).  Dr. Gholson indicated that plaintiff was mildly anxious, and her attention and concentration were fair.  (Tr. 284).  Dr. Gholson diagnosed plaintiff with moderate major depression, with a

---

[8]Citalopram is an antidepressant indicated for the treatment of depression.  See Physician's Desk Reference, ("PDR"), 1161 (63rd Ed. 2009).

GAF score of 70.[9]  (Id.).  Dr. Gholson completed a "Physician's Certification/Disability

Evaluation" form, in which he expressed the opinion that plaintiff did not have a disability.  (Tr.

278).

       Plaintiff presented to the emergency room at Twin Rivers Regional Medical Center on

August 21, 2009, with complaints of lower back pain and wrist pain resulting from a fall.  (Tr.

286).  Upon examination, plaintiff's straight leg raise test was negative bilaterally, no paralumbar

tenderness was noted, no paralumbar spasm was noted, and plaintiff's sensory exam was intact.

(Tr. 287).  Plaintiff's Tinels sign[10] was positive in both wrists.  (Tr. 288).  Plaintiff was diagnosed

with carpal tunnel syndrome,[11] chronic low back pain, and acute lumbar myofascial[12] strain.  (Id.).

Plaintiff was discharged with instructions to use warm compresses on her back and follow-up with

Dr. Muse.  (Id.).  The examining physician also prescribed Toradol,[13] and wrist splints.  (Tr. 289).

       Plaintiff presented to Dr. Lecorps on August 27, 2009, with complaints of neck and upper

---

[9]A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

[10]A sensation of tingling or of "pins and needles" felt at the lesion site or more distally along the course of a nerve when the latter is percussed; indicates a partial lesion or early regeneration in the nerve.  Stedman's at 1772.

[11]The most common nerve entrapment syndrome characterized by paresthesias, typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand.  Stedman's at 1892.

[12]Of or relating to the fascia surrounding and separating muscle tissue.  Stedman's at 1272.

[13]Toradol is indicated for the short-term treatment of moderate to severe pain.  See WebMD, http://www.webmd.com/drugs (last visited August 20, 2012).

and lower back pain. (Tr. 332). Plaintiff reported that her back pain started after being involved in a motor vehicle accident on March 30, 2007. (Id.). Upon examination, plaintiff was able to bend over and touch her toes. (Id.). Hyperextension of the lumbosacral spine and lateral flexion on the right and left side were limited. (Id.). Dr. Lecorps stated that x-rays were negative except for some degenerative disc disease at L5-S1. (Id.). Dr. Lecorps' impression was cervical and possibly dorsal myofascitis[14] with degenerative disc disease of the lumbosacral spine. (Id.). Dr. Lecorps completed a "Physician's Certification/Disability Evaluation" form, in which he expressed the opinion that plaintiff did not have a disability. (Tr. 335).

Plaintiff saw Jerry Muse, M.D. in August and September of 2009 for various complaints, including right extremity pain, headache, and an acute illness. (Tr. 344-47). Dr. Muse ordered x-rays of plaintiff's right wrist and right ankle in August 2009, which revealed no abnormalities. (Tr. 328).

Plaintiff saw Shahid K. Choudhary, M.D. on September 23, 2009, upon the referral of Dr. Muse. (Tr. 336-37). Plaintiff complained of numbness in both of her hands and difficulty gripping, which began six to twelve months prior. (Tr. 336). Plaintiff reported that she woke up at night due to these symptoms. (Id.). Plaintiff also complained of neck pain and chronic low back pain. (Id.). Plaintiff denied any radiation of her neck pain down to her arms. (Id.). Upon examination, plaintiff had full strength in both upper and lower extremities, although she complained that she was unable to grip. (Tr. 337). On sensory examination, plaintiff had decreased sensation to touch and pinprick involving her whole hand, which did not appear to be in

---

[14]An inflammatory myopathy detected in patients with diffuse arthromyalgias and severe fatigue. Stedman's at 1272.

any dermatomal[15] fashion.  (Id.).  Plaintiff's gait was normal.  (Id.).  Dr. Choudhary's impression

was: numbness of her hands.  (Id.).  Dr. Choudhary stated that plaintiff's symptoms were

somewhat atypical, as they were not in any dermatomal fashion, and nerve conduction studies did

not reveal evidence of cervical radiculopathy[16] or carpal tunnel syndrome.  (Id.).  Plaintiff

underwent x-rays of the cervical spine, which revealed minimal degenerative changes.  (Tr. 338).

Dr. Choudhary recommended an MRI of the cervical spine to rule out any possibility of cervical

spinal disease.  (Tr. 337).  He indicated that, if there was no significant abnormality, then plaintiff

would need physical and occupational therapy.  (Id.).

Plaintiff underwent an MRI of the cervical spine on October 8, 2009, which revealed mild

straightening of the cervical curvature, most likely due to muscle spasm; and mild degenerative

disc disease.  (Tr. 341).

Plaintiff presented to Dr. Gholson on November 4, 2009, for a psychological examination.

(Tr. 349-54).  Plaintiff reported that she was worried about "getting [her] disability," and about

her father.  (Tr. 350).  Plaintiff also complained of some difficulty going to sleep, some mood

difficulties, occasional irritability, and low energy.  (Id.).  Plaintiff reported no isolation and

indicated that she felt "pretty good about her life."  (Id.).  Dr. Gholson indicated that the

following symptoms were also present: anxiety, some difficulty getting along with others,

depression, and long-term memory loss.  (Id.).  Plaintiff reported that she was taking Citalopram.

(Tr. 352).  Dr. Gholson noted that plaintiff was cooperative, and that her attention and

_____

[15]A dermatome is an area of skin supplied by cutaneous branches of a single cranial or spinal nerve; neighboring dermatomes can overlap.  Stedman's at 519.

[16]Disorder of the spinal nerve roots.  Stedman's at 1622.

concentration were average.  (Tr. 354).  Dr. Gholson diagnosed plaintiff with moderate, recurrent

major depressive disorder, with a GAF score of 65.  (Id.).

## C.    <u>Other Evidence</u>

Plaintiff's mother, Maudie Shipman, completed a statement on December 19, 2009.  (Tr.

199).  Ms. Shipman stated that plaintiff tends to lose her grip and drop items.  (Id.).  Ms. Shipman

stated that plaintiff also has difficulty cleaning because she is unable to bend over to pick up items.

(Id.).  Ms. Shipman also stated that she had seen plaintiff lie down due to pain.  (Id.).

In a statement dated December 21, 2009, Jerry Umfress indicated that plaintiff had been

experiencing difficulty with her back and hands for the past few years.  (Tr. 200).  Mr. Umphress

stated that plaintiff frequently drops items, and occasionally requires assistance getting up when

she bends over.  (Id.).


## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since June 17, 2008,
      the application date (20 CFR 416.971 *et seq*.).

2.    The claimant has the following severe impairment: degenerative disc disease (20
      CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that
      meets or medically equals one of the listed impairments in 20 CFR Part 404,
      Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the
      residual functional capacity to perform medium work as defined in 20 CFR
      416.967(c) except the claimant should avoid more than frequent crawling or
      climbing.

5.    The claimant has no past relevant work (20 CFR 416.965).

- 14 -

6.      The claimant was born on March 16, 1985, and was 23 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since June 17, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 15-25).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income protectively filed on June 17, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 25).


**Discussion**

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's

- 15 -

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

- 16 -

significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

- 17 -

## C.   Plaintiff's Claims

Plaintiff first argues that the ALJ erred in finding that plaintiff's obesity did not constitute a medically determinable impairment.  Plaintiff also argues that the ALJ erred in failing to elicit testimony from a vocational expert.  Plaintiff finally argues that the ALJ failed to fully and completely develop the record when denying plaintiff's request for IQ testing.  The undersigned will discuss plaintiff's claims in turn.

## 1.   Obesity

Plaintiff contends that the ALJ erred in finding that plaintiff's obesity did not constitute a medically determinable impairment.  Plaintiff argues that the ALJ did not, therefore, consider plaintiff's obesity when determining plaintiff's RFC.  Plaintiff acknowledges that a specific diagnosis of obesity may be lacking in this case, but maintains that the ALJ should have found that plaintiff was obese based on her height and weight.

The ALJ discussed the issue of whether plaintiff was obese, and the effect of plaintiff's weight on her ability to work.  (Tr. 15-16).  The ALJ acknowledged that, at five-feet seven-inches tall and 230 pounds, plaintiff was overweight.  (Tr. 15).  The ALJ noted that there was no diagnosis from an acceptable medical source that plaintiff's weight constitutes a medically determinable impairment of obesity.  (Id.).  The ALJ further found that, even if plaintiff were considered to have a medically determinable impairment related to her weight, it was not severe as defined by the Social Security Act and regulations.  (Tr. 16).  The ALJ indicated that he had considered plaintiff's obesity pursuant to Social Security Ruling 02-01p in determining whether she had a medically determinable impairment that is severe, whether her impairment meets of equal the requirements of a listing, or whether the impairments prevent her from doing past

- 18 -

relevant work and other work.  (Id.).  The ALJ stated that the medical evidence does not indicate

that plaintiff's obesity independently causes her more than slight or minimal limitations, or that it

exacerbates or is exacerbated by any of her other medically determinable impairments.  (Id.).  The

ALJ pointed out that none of plaintiff's physicians advised her to diet or lose weight, or imposed

any limitations in work-related functioning attributable to plaintiff's weight.  (Id.).

 Social Security Ruling ("SSR") 02-01p, 2000 WL 628049, at *2-5 (Sept. 12, 2002),

states, in relevant part, that:

> Obesity is a complex, chronic disease characterized by excessive accumulation of
> body fat.  Obesity is generally a combination of factors (e.g., genetic,
> environmental, and behavioral).  .  .  .
>
> > We will consider obesity in determining whether:
> > > The individual has a medically determinable impairment. . . .
> > > The individual's impairment(s) is severe. . . .
> > > The individual's impairment(s) meets or equals the requirements of
> > > a  listed impairment in the listings. . . .
> > > The individual's impairment(s) prevents him or her from doing past
> > > relevant work. . . .
>
> > If an individual has the medically determinable impairment obesity that is
> > "severe" as described  [above], we may find that the obesity medically equals a
> > listing. . . . We may find in a title II claim, or an adult claim under title XVI, that
> > the obesity results in  a finding that the individual is disabled based on his or
> > residual functional capacity (RFC), age, education, and past work experience.
> > However, we will also consider the possibility of coexisting or related conditions,
> > especially as the level of obesity increases.  .  .  .
>
> > There is no specific weight or BAI that equates with a "severe" or a "not
> > severe" impairment.  . . . Rather, we will do an individualized assessment of the
> > impact of obesity on an individual's functioning when deciding whether the
> > impairment is severe. . . .
>
> > Because there is no listing for obesity, we will find that an individual with
> > obesity may meet the requirements of a listing if he or she has another impairment
> > that, by itself, "meets" the requirements of a listing.  We will also find that a listing
> > is met if there is an impairment that, in combination with obesity, meets the
> > requirements of a listing.  For example, obesity may increase the severity of

coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.

The undersigned finds that the ALJ properly evaluated plaintiff's obesity. The ALJ specifically stated that he considered plaintiff's obesity pursuant to SSR 02-01p. None of plaintiff's physicians diagnosed plaintiff with obesity, or placed any physical limitations on her ability to perform any functions, work-related or otherwise, due to her weight. At the hearing, plaintiff did not testify as to any work-related limitations caused by her obesity. Because neither plaintiff's medical records nor her testimony indicated that she had any work-related limitations due to her weight, the ALJ's failure to find obesity as a medically determinable impairment or any work-related limitations caused by plaintiff's weight was not error. See McNamara v. Astrue, 590 F.3d 607, 612 (8th Cir. 2010); Strickland v. Barnhart, 143 F. App'x 726, 727 (8th Cir. 2005) (per curiam) (holding ALJ's failure to discuss the effect of the claimant's obesity on the claimant's RFC was not error because no physician had imposed any work-related limitations related to the claimant's obesity). The court finds, therefore, that the ALJ's consideration of Plaintiff's obesity is consistent with SSR 02-01p and that it is based on substantial evidence.

## 2.      Duty to Develop the Record

Plaintiff argues that the ALJ failed to fully and completely develop the record when denying plaintiff's request for IQ testing. Specifically, plaintiff contends that Dr. Rexroat found that plaintiff appeared to be functioning below the average range of intelligence, although no IQ testing was performed.

It is well established that "[a] social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); accord Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010); Jones, 619 F.3d at 969.

- 20 -

"'The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether a claimant is disabled.'"  Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010) (quoting Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)).

In the instant case, as plaintiff points out, Dr. Rexroat estimated plaintiff's IQ as below average, but he did not perform IQ testing.  (Tr. 262).  Although plaintiff underwent two additional consultative psychological examinations, IQ testing was never conducted.

At the administrative hearing, the ALJ noted that there was no evidence in the record that plaintiff had undergone IQ testing.  (Tr. 47).  Plaintiff's attorney indicated that he was requesting that the ALJ consider having plaintiff undergo IQ testing.  (Id.).  The ALJ stated that he would "get back to that" issue, and instructed plaintiff's attorney to "prepare to entertain discussions about having some testing done."  (Id.).  The ALJ, however, did not further discuss the issue of IQ testing and did not order any such testing.

Dr. Rexroat's opinion that plaintiff's IQ was below average is supported by other evidence in the record.  At the hearing, plaintiff testified that she completed the ninth grade, and stopped attending school in January of her tenth-grade year.  (Tr. 58).  Plaintiff stated that she did not take any special education classes, although she indicated that her school "tried to put [her] in special Ed or resources."  (Id.).  Plaintiff testified that she took speech therapy classes until the ninth grade, and that she had difficulty pronouncing long words.  (Tr. 37).  Plaintiff testified that she took the GED on one occasion and failed.  (Tr. 36).  Plaintiff stated that she failed the test because she obtained low scores in math, science, and social studies.  (Id.).  Plaintiff testified that she had difficulty with reading comprehension.  (Tr. 46).  Plaintiff indicated that she had never

- 21 -

taken the driver's license test because the material in the test preparation book was too difficult for her to comprehend. (Id.). Plaintiff testified that she enjoyed reading children's books. (Id.).

Dr. Gholson saw plaintiff for consultative psychological examinations on two occasions. In April 2009, Dr. Gholson found that most of plaintiff's intellectual functions were normal, but indicated that plaintiff's remote memory and ability to perform serial sevens were "low/below average," and her ability to make change for a dollar was "very low/inadequate." (Tr. 283). In November of 2009, Dr. Gholson noted that plaintiff had experienced long-term memory loss. (Tr. 350). Dr. Gholson found that plaintiff's remote memory and ability to make change for a dollar were "low/below average." (Tr. 353).

The undersigned finds that the evidence of record discussed above, combined with Dr. Rexroat's opinion that plaintiff's IQ was below average, indicate the existence of a question concerning plaintiff's intellectual functioning. As such, the ALJ erred in ignoring the opinion of Dr. Rexroat and not further developing the record through valid IQ testing. See Reeder v. Apfel, 214 F.3d 984, 987 (8th Cir. 2000) (remanding for valid resting and further development of record where ALJ disregard physician-estimated IQ that fell within listing range); Gasaway v Apfel, 187 F.3d 840, 844-45 (8th Cir. 1999).

Plaintiff also contends that the ALJ should have obtained vocational expert testimony in determining whether plaintiff retained the RFC necessary to perform gainful employment. "When a claimant suffers from exertional and nonexertional impairments, and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997). The ALJ in this case did not include any intellectual limitations in

his RFC.  (Tr. 17).  Where evidence demonstrates that a claimant lacks adequate intellectual capacity, an ALJ is precluded from relying on the Medical-Vocational Guidelines to find a claimant not disabled.  <u>Muncy v. Apfel</u>, 247 F.3d 728, 735 (8th Cir. 2001); <u>Holz v. Apfel</u>, 191 F.3d 945, 947 (8th Cir. 1999).  An intellectual impairment, therefore, constitutes a non-exertional impairment which must be considered by a vocational expert.  <u>Spencer v. Bowen</u>, 798 F.2d 275, 277 n. 2 (8th Cir. 1986).  As such, if plaintiff is found to have an intellectual impairment, the ALJ must obtain vocational expert testimony to determine how it affects her RFC.

<u>Conclusion</u>

In sum, the undersigned finds that the record before the ALJ raises questions regarding the level of plaintiff's intellectual functioning and its effect on the ALJ's determinations at each step of the sequential analysis.  As such, this cause will be reversed and remanded to the ALJ in order for the ALJ to order valid IQ testing, and reassess plaintiff's residual functional capacity based on the developed record.  If plaintiff is found to have an intellectual impairment, the ALJ should obtain vocational expert testimony to determine how it impacts her residual functional capacity.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  _12th_  day of September, 2012.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE